CHARLES G. SELF *v.* STATE OF MISSISSIPPI.

[43 South., 945.]

CRIMINAL LAW AND PROCEDURE.   *Evidence, Exhibits. Experts.*

> Where the condition of decedent's skull at the time of his death was a material enquiry, the testimony of experts who did not see it until disinterred two years afterwards and the skull itself were inadmissible in evidence, where it had decayed to such an extent that the witnesses could not do more than speculate touching its condition at the time in question.

FROM the circuit court of Attala county.

HON. JOSEPH T. DUNN, Judge.

Self, the appellant, was indicted and tried for the murder of one William Proctor, was convicted of manslaughter, sentenced to the penitentiary for a term of eight years and appealed to the supreme court.   The facts touching the point on which the case was decided sufficiently appear from the opinion of the court.

*Daniel & Adams,* for appellant.

It would have been error to have permitted the introduction of the whole skull, intact, unless the prosecution had first shown that the then condition of the same, with reference to the alleged wound and injury, was the same as at the time in issue, to-wit: immediately after the infliction of the said alleged wound.

"The present condition of an object offered may not be the same as at the time in issue, nor so nearly the same as to be proper evidence of its former condition; accordingly, autoptic proference is allowable only on the assumption that the condition is the same or sufficiently similar." 2 Wigmore's Evidence, sec. 1154, subd. (6). "The fact that a post-mortem examination was made long after death is no reason in itself for its exclusion as evidence, if the body was in such a state of preservation that the jury could judge whether its condition was caused by injuries inflicted before or after death." 21 Ency. Law & Procedure, 947, sub. (111).

If such great precautions should be observed as a prerequisite to the proper introduction of the entire skull, intact, then it follows *a priori* that even greater precautions should have been taken before permitting the introduction of a small section of skull.

The section of skull introduced was not properly identified and authenticated with reference to the alleged wound, the extent and location of same.

*Teat & Teat,* on the same side.

The practice of the prosecution to disinter the body of the deceased during the trial of the case and spring it as a surprise on the defendant, his counsel and the jury in open court without any notice whatever to the defendant seems to be growing in popularity in this district, it having been done here before in the trial of the *Bell case* which has been twice reversed by this court. As to how well the practice comports with justice or fairness we leave for others to judge, but considering the ghastly and appalling effect of a description of the kind and character of the one at bar, together with an exhibition of portions of the skeleton to the jury, coming as a complete surprise, we think the state should at least in the execution of its nice little effort at tragedy, be required to conform to the ordinary rules of evidence, that where an ex-

hibit is introduced in evidence the whole of the exhibit should be brought in. If the jury are to conclude that the fractures in the section of skull were produced by a blow from the defendant, they should have an opportunity to see likewise for themselves that there are not similar fractures and cracked portions of skull on the other side and parts of the head. We contend that the introduction of this portion of skull was incompetent for many reasons; that it was not properly shown in fact to be a part of the skull of the deceased, that two years had elapsed since the death and burial of the deceased, and that decay and disintegration of bones and the joining of bones in the skull had so set up that the physical appearance of the section of skull was necessarily so badly exaggerated and distorted as to sweep the mind of the jury beyond rational moorings in a fair consideration of the evidence, accompanied with the fact of the dramatical display of the prosecution and natural surprise produced on the mind of the jury by the unusual evidence of the disinterment of the corpse and its condition of preservation, etc. Clandestine performances of the kind here in evidence not in conformity with the provisions of the statute in such cases made and provided should be discouraged by the courts, because, like dying declarations, the opposite party is placed at disadvantage and great opportunity is afforded for mischief.

The proper course to pursue in a case where death has followed an injury which seems insufficient alone to produce death is for the coroner or court to order a post-mortem examination (Code 1892, § 824, 31 L. R. A., 540).

The result of such examination should be excluded where the interval is so long and the condition of the body is such that the jury could not reasonably find whether its condition was attributable to ante-mortem or post-mortem causes. Hughes Criminal Law, p. 40.

*R. V. Fletcher,* attorney-general, for appellee.

Opinion of the court.

Argued orally by *J. A. Teat,* for appellant, and by *R. V. Fletcher,* attorney-general, for appellee.

WHITFIELD, C. J., delivered the opinion of the court.

After the most careful consideration of the evidence in this case, we are clearly of the opinion that the part of the skull exhibited to the jury in this case and the evidence as to the post-mortem examination should all have been excluded from the jury. This post-mortem examination occurred two years after the burial of the deceased. The evidence shows strongly the action of the elements of decay upon the skull. Only half of the head was brought before the jury, and that half in several fragments, requiring to be held together, as indicated by the evidence. The post-mortem examination was *ex parte,* without notice to the defendant. It is not a case of a post-mortem examination made within any recent time after burial, but one made, as stated, two years thereafter.

Three physicians were examined—two for the state, and one for the defense—as to whether the condition of the skull was substantially the same at the time of its exhibition to the jury as it was when the deceased died, and there is anything but harmony between the physicians on this subject. Dr. Turnipseed, speaking in response to the question, "Was it fractured to that extent when you made your examination?" replied: "No, sir; it was not. If it had been, I would have felt that giving away feel, and I didn't do it." He says again: "I pressed with great pressure over the wound, and could not detect any deformity whatever. I could not cause the bones to sink down—any sinking, giving away, or boggy feel. I could not detect any softness by palpating or pressing around the wound on the surface." And again he said: "It seems to me like it would be a very easy matter to detect a fracture in this condition [*i. e.,* the condition of the skull when exhibited to the jury]. It seems to me like most any child could detect the fracture in this case, and the slightest little

pressure in such a fracture as that would produce a boggy feel, with pressure." Dr. Coleman on the cross-examination very sensibly observed: "I will say this. It is unfortunate that you have not got the whole skull, because, as I understand it, this man has been buried two years." Dr. Carnes testifies, in speaking of the condition of the body in the grave, that he found the skeleton lying there; that, of course, the flesh had all rotted; and that he separated the head from the body and lifted it out. He says, further, that the skull was lying attached to the body, and was covered with mold and decayed matter, so much so that the breaking at first was not so apparent, but that on closer examination he found that the skull was crushed, so much so that a little pressure there caused a little part of it to fall in. He says the whole skull was in a natural position at the time he found it, and that he separated the part of the skull exhibited to the jury with a bone saw, and removed the part that showed the effects of the injury, with the exception of about one-half an inch, where the cracked part ran so far back that he did not notice it until he had sawed through. He also stated that, from the general crushing of the bones on the left side of the head, it was necessary to place cotton therein. He further says that the fractures were all broken out clear, so that, in examining the bone, those fractured parts dropped out, and that the part exhibited to the jury was all absolutely broken in, so that it fell out almost on touch, and that they were broken before the examination, and that, as he continued the examination, to see the extent of the fracture, all those pieces dropped in, and he took them out of the decayed matter inside of the head, so that he could place them back in position. He further says that the inner wall or lining was all decayed, and that that was the reason the parts dropped in.

It must be noted that we are not speaking of this testimony with respect to the single fact as to whether the skull was the skull of the deceased, in other words, with respect to the iden-

tification of the skull.  We are dealing solely with the question of the competency of this evidence, as showing with the clearness that it ought to have been shown that the skull, granting it to be the skull of the deceased, was in the same condition at the time of its exhibition to the jury that it was in at the time of the burial.  On this proposition the rule is thus laid down in Wigmore on Evidence, sec. 1154, subd. 6: "The present condition of an object may not be the same as at the time in issue, nor so nearly the same as to the proper evidence of its former condition.  Accordingly, autoptic proference is allowable only on the assumption that the condition is the same or sufficiently similar."  That is the precise point. Was the evidence in this case, on this subject, proper evidence of the former condition of this skull?  It must be admitted that this is a character of evidence quite likely to unduly weigh with the jury, and for that reason its admission should be most scrupulously guarded.  All the proper preliminary evidence should be clear and satisfactory.  It is said in 2 Wigmore on Evidence, sec. 1157, at p. 1354, after reviewing the cases: "There is a natural tendency to infer from the mere production of a material object the truth of all that is predicated of it.  Second, the sight of deadly weapons, cruel injuries, etc., tends to overwhelm reason and to associate the accused with the atrocity without sufficient evidence."  All this applies with marked emphasis to the production before an average jury of the skull of the deceased.

Weighing the matter carefully, we are constrained to think this testimony falls far short of measuring up on the point indicated to legal requirements, and for this error alone, not now passing on any other assignment, the judgment is reversed, and the cause remanded for a new trial.