CASES ARGUED AND DETERMINED

IN THE

# SUPREME COURT OF MISSISSIPPI

AT THE

## MARCH TERM, 1911.

---

### MRS. IDA MURRAY *v.* NATCHEZ DRUG COMPANY.

[56 South. 330.]

1. MASTER AND SERVANT. *Safe place to work. Delegation of duty. Assumption of risk. Contributory negligence. Question for jury.*
   The duty of the master to furnish the servant a safe place in which to work, cannot ordinarily be delegated to fellow-servants and the risk relative thereto is not such as is ordinarily assumed by the servant.

2. SAME.
   It is the duty of the master to use every reasonable effort to see that the place in which his employees work is safe and they have a right to assume that this duty will be strictly complied with.

3. MASTER AND SERVANT. *Negligence of master. Sufficiency of evidence question for jury.*
   It is the peculiar duty of the jury to pass upon the facts as to whether contributory negligence exists, even if it could be involved in a case based on the master's failure to supply a reasonably safe place in which to work.

(260)

APPEAL from the circuit court of Adams county.

HON. M. H. WILKINSON, Judge.

Suit by Ida Murray for the death of her daughter, against the Natchez Drug Company. From a judgment for defendant the plaintiff appeals.

The appellant brought an action against the appellee for damages for the death of her daughter, who was employed by the appellee in its wholesale drug store. Appellee's business was conducted in a large five-story brick building, in one part of which was a chemical laboratory. A large number of persons were employed in the building, which was destroyed by an explosion in which several of the employees were killed, among the number being appellant's daughter. The declaration alleges in one count that the explosion was caused by the negligence of the appellee in permitting the building to become filled with escaping gas, which became ignited. Another count of the declaration charges the careless and negligent handling by appellee's employees of dangerous explosives, such as nitroglycerine or dynamite. The court gave a peremptory instruction for the defendant, from which an appeal is taken.

*Charles F. Engle,* for appellant.

The duty of the appellee to provide a 'safe place to work, and to keep it safe, was not only non-delegable, but a continuing one. The duty of the appellee in this respect called for constant, never-ceasing vigilance. The appellee should have rendered the place of work safe, even if to do this required the closing of the laboratory or even the entire building. *So. Ry. Co.* v. *Wiley,* 88 Miss. 825, 41 So. 511; *Kneale* v. *Lopez & Jukate,* 93 Miss. 201, 46 So. 715.

In 7 Am. and Eng. Ann. Cases, 458, the duty of the master in this respect is presented ably and well, though the rule *res ipsa* does not seem to have been invoked. A distinction also is drawn between cases of naked conjecture and those of reasonable probability.

The appellee itself introduced the gas into the building; it knew that the gas was leaking; that the plumber's assistant could not remedy the trouble, as he had tried several times and failed; it made no inspection adequate to the demands, the imminent demands of the situation, and no inspection could, under the circumstances, relieve it from liability. *Brister* v. *Ill. Cent. R. R. Co.*, 36 So. 142-144; *Columbus L. V. T. Ry. Co.* v. *Celley*, 1 Ohio Cir. Ct. R. 267.

In 21 Am. and Eng. Ency. (2d Ed.), page 487, we find the rule laid down: "In order that a party may be liable in negligence it is not necessary that he should have contemplated, or even been able to anticipate, the particular consequences which ensued, or the precise injuries sustained by plaintiff. It is sufficient if, by the exercise of reasonable care, the defendant might have foreseen that some injury would result from his act or omission, or that consequences of a generally injurious nature might have been expected."

Certainly no consequences other than injurious could be expected by any sane person from the continuous presence of escaping gas into a building, such as occupied and used by appellee, for a period extending over a great part of two working days, and all of one entire night.

The facts in *Burrus* v. *The March Gas & Coke Co.*, L. R. 5, Exch. 67 (Court of Exchequer, Hilary Term, 1870), were as follows: The defendants, a gas company, contracted to supply the plaintiff with a proper service pipe to convey gas from main outside to a meter inside his premises. Gas escaped from the pipe laid down under contract into the plaintiff's shop. The servant of a gasfitter employed by the plaintiff happened to be at work in another room at the time of the escape, and went into the shop, hearing of it, with a view of finding out its cause. He was carrying a lighted candle in his hand and immediately on entering the shop an explosion took place, doing damage to the plaintiff's premises and stock.

On the trial of an action against the defendants to recover for the injury sustained, the jury found, first that the escape of gas was occasioned by a defect in the pipe, and that the defect existed in the pipe when supplied, and secondly, that there was negligence on the part of the gas-fitter's servant in carrying a lighted candle. Upon these findings it was held that the plaintiff was entitled to recover, and that the defendants were not relieved from responsibility by the negligent act of the gas-fitter's servant. Kelly, C. B., and Pigott, B., in their opinions, said the cause of action was negligence of defendants, from the consequences of which the intermediate negligence of a person not in plaintiff's service could not relieve them, and Martin, B., said even if the person whose negligence was the intermediate cause of the explosion had been in plaintiff's service, the defendants would nevertheless have been liable. 6 Am. Neg. R. 13, note 2. See, also, Wharton's Law of Negligence (2d Ed.), sec. 77, where it is stated: "The fact is that the consequences of negligence are almost invariable surprises. A man may be negligent in a particular matter a thousand times without mischief; yet, though the chance of mischief is only one in a thousand, we would continue to hold that the mischief, when it occurs, is imputable to negligence." *Payne* v. *Georgetown Lbr. Co.*, 117 La. 983, 42 So. 475; *Rose* v. *Stephens & C. Transfer Co.*, 20 Blatchf. 411, 11 Fed. 438.

In this last case cited, Wallace, J., said: "Undoubtedly the presumption has been more frequently applied in cases against carriers of passengers than in any other case of negligence; but there is no foundation in authority or reason for any such limitation of the rules of evidence. The presumption originates from the nature of the act, not from the nature of the relations between the parties. It is indulged as a legitimate inference whenever the occurrence is such that in the ordinary course of things it does not take place when proper care is exercised, and

is one for which the defendant is responsible.'' See, also, *Lykiardopoulo case,* 53 So. 575.

There is nothing that the master can do that will relieve him of the obligation to provide his servant a safe place to work; this obligation is one that can be discharged by performance only.

In *McNamara* v. *MacRonough et al.,* 102 Cal. 575, the master employed a carpenter to make the scaffoldings used by his employees; the plaintiff, an employee, was injured by one of these falling and the master was held liable though the plaintiff had helped construct the particular scaffold which fell.

In 4 Thompson on Negligence, sec. 3874, we find the rule stated: ''Sec. 3874. This duty, primary, absolute and non-assignable. As in other cases, the obligation of the master to see that the place where his servant is required to work is reasonably safe, is primary, absolute and non-assignable, in the sense that the master is responsible for the negligence of any servant or agent, of whatever grade, to whom he delegates the performance of it.''

Thus do we see even the fellow-servant doctrine abolished or suspended when it comes to this primary, absolute, non-assignable, non-delegable duty.

*Martin & Bowman,* for appellee.

Counsel discount the argument on assumption of risk by saying that there was no proof that plaintiff's intestate was warned, or knew and realized that there was any danger. To this we reply in counsel's own words, last above quoted. She was warned; the testimony is convincing that all the employees who were working in the laboratory on Saturday knew that the gas was present and that it continued to be present there the entire day long. That was all-sufficient warning. But they say that there is no evidence to show that she was informed of the danger arising from constantly escaping gas. She was no child, she was a woman grown, and had been

working at the place for two or three months. If the Natchez Drug Company, which was not engaged in the business of manufacturing and distributing illuminating gas, and not, therefore, to be presumed to have anything more than common knowledge, or information, as to its qualities, is to be held to knowledge of the danger arising from the escape of such gas, and to be held negligent in not closing down when it knew, or should have known, that notwithstanding the efforts to remedy the trouble it still existed, why should not the fully-matured servant be held to the same presumption of knowledge? More especially so when the evidence indubitably shows that she and her co-workers in the laboratory had more and better knowledge of the gas conditions through the day than anybody else in the building. 4 Thompson's Commentaries on Negligence (2d Ed.), sections 4643, 4647, 4658; 26 Cyc. 1241, paragraph (d).

We do not think that the doctrine of *res ipsa loquitur* applies in this case. All the facts touching the building, its character, the business carried on there and the kind of stock and materials contained in it, are in evidence. It is true that the drug company was not called on for an explanation, but all the explanation possible, or that it could give, was already before the court in the testimony of plaintiff's witnesses, nearly all of whom were employees of the defendant. The cause of the explosion remains a mystery, unless it be attributed to the gas. Outside of the gas theory the plaintiff is bound to fail, for upon her devolves the duty of showing negligence.

In a moment of time the Natchez Drug Company and those of its servants who suffered were involved in one common destruction. It lost its plant and stock, they lost their lives. This was the work of outside parties, by whom a condition was brought about that was never contemplated by anyone but that was better known, both in its incipiency and continuation, to the servants who perished than to their employer. If he owed them a place to work they surely owed him information that the place

was no longer safe. It would be hard indeed if this defendant, after the enormous loss it has sustained, should, through the magic words "master and servant," be financially destroyed for the benefit of the estates of those whose knowledge and information were coextensive with, and far superior to, that which it possessed.

WHITFIELD, C.

The theory that the explosion was caused by dynamite is wholly untenable. It was manifestly caused by gas. The facts in the case are substantially as follows, as fairly set out in appellant's brief:

"On Friday, March 13, 1908, the gas company was notified to turn on the gas, and about 2:15 of that day Frank O'Brien, the employee and representative of the gas company, turned on the gas, the gas pipe having a capacity of sixty cubic feet per hour. (See page 42, line 7, of the record.) Almost immediately after this was done the odor of escaping gas was detected in the building and in the laboratory. (See pages 49 and 51.) Nothing was done about this, however, and Saturday morning, when the girls came to work about 8 o'clock a. m., the presence of gas was so noticeable that the windows in the laboratory were raised. (See page 49.) The plumber was notified, and sent his assistant, Mr. Burns; but he could not locate the leak, and about 9 o'clock a. m. Mr. Laub asked O'Brien, the gas company's representative, to find the leak, and stated that Burns could not find it. (See page 44.) O'Brien then cut off the gas, after satisfying himself that there was no leak between the meter and the gas mains in the street, the part he had installed, and about 10 o'clock a. m. notified Burns that there was a leak in the gas connection inside the building, and that he had rejected the pipework. (See page 45.) About 10:30 a. m., same day, Burns appeared at the office of appellee, and asked Mr. Hodge, the bookkeeper, for the keys to the room where the meter was kept; this room being known as the "corn room."

The keys were given him, but no officer of appellee took enough interest to go along and look into the matter. Burns turned on the gas, and in about fifteen minutes returned to the office of appellee with the keys and said: "I have found the leak and fixed it." This happened at 10:45 a. m.. (See page 25, lines 4 to 22.) At about 11:30 the same day, Mr. White, an employee of appellee, who at the time was filing the place of vice-president, who was absent, appeared at the office and asked Mr. Chambliss, the president of the company, if he smelled gas, and Mr. Chambliss replied that it had been attended to. Mr. White then rushed on to his business. (See pages 60 and 61.) Mr. Mallery, another employee of the appellee, who had charge of the second floor, detected the odor of gas about 10 a. m., but went on with his work until between 11 a. m. and 12 m. Mr. White, prescription clerk for appellee, came up to the second floor and advised Mr. Mallery that he had better have something done about the gas or it would knock him out. (See pages 59 and 60.) Upon receiving this advice, Mr. Mallery telephoned to the office, and notified the office that gas was escaping in the building. This notice was given after 11 a. m., but before 12 m., and as witness testified about 12 m., the same day. (See page 60.) Nothing was done in the premises, as testified to by Mr. Hodge, the office man, until about a quarter or ten minutes to 2 o'clock that afternoon, when Mr. Mallery telephoned to Mr. Burns about the leak. (See page 26.) Nothing else was done in connection with the matter by appellee. There was no interruption of the business. The place was not closed down, or the girls or other employees sent home, until the dangerous condition of affairs could be remedied. The appellee contented itself with telephoning. (See page 26.)

"The explosion occurred about 2:45 p. m. of the same day, Saturday, March 14, 1908, and a few minutes before the explosion Burns, the plumber's assistant, was seen in the laboratory by Miss Simms, an employee, with a

lighted candle in his hand. While there he lit the gas in the laboratory, blew it out, gave it as his opinion that the leak was below, and left the laboratory with the lighted candle in his hand. (See page 50.) Some minutes later the employees, and the community generally, were startled by the noise and shock of an explosion. The building of the Natchez Drug Company was a wreck, Mr. Laub, the chemist and vice-principal, Mr. Burns, the plumber's assistant, and about ten young ladies, including the daughter of appellant, were all dead, their bodies in the ruins beneath an immense pile of debris. Immediately upon hearing the noise of the explosion, Miss Simms and Miss Booth, two employees who worked in the laboratory, and who were in the dressing room at the time, rushed out in the direction of the laboratory, but were met at the laboratory by a gush of suffocating smoke, which smelled of gas and which issued from the laboratory. They turned affrighted and fled down the stairs to the street and safety, the only survivors of the ill-fated number who worked in the laboratory. All other employees of the appellee escaped. (See pages 49 and 50.) A few seconds after the explosion the west wall of the building was seen to split open at the top and collapse. The rear wall had already been blown down, as well as the east wall as evidenced by the fact that the witness who saw the west wall give way (Chas. Fitzpatrick) testified that after the west wall fell in he could see right through and beyond the building. (See pages 16 to 17.) Throughout the entire day of Saturday, March 14, 1908, the odor of escaping gas was noticeable in the laboratory, but the chemist and vice-principal of appellee did not permit this to interrupt his work in the chemical department, but was seen at his work throughout the day up to the time of the explosion, and after his request of Mr. O'Brien at 9 a. m. to locate the leak does not appear, from the evidence, to have in any way concerned himself further about the matter. There was a system of private

telephones connecting the office with different parts of the building, but no inquiry was made from the office of the laboratory or other department as to the condition as regards the leaking gas. All the witnesses who testified to the presence of gas in the building and the incidents above related were employees of the company, and, with the exception of Miss Booth and Miss Simms, were in the employ of the appellee at the time they testified."

The court on this testimony gave a peremptory charge for the defendant. The defense chiefly relied on is contributory negligence and the assumption of risk on the part of the deceased employee whose mother brings this suit. The suit is bottomed on the non-delegable duty of the master to furnish the servant a safe place to work. This court has said on this subject, in the well-considered case of *Alabama & Vicksburg Railway Company* v. *Groome,* 52 South. 703, through Justice Smith: "The duties of the master relative to furnishing the servant a safe place in which to work cannot ordinarily be delegated to fellow-servants, and the risk relative thereto is not such as is ordinarily assumed by the servant." See exhaustive review of authorities contained in notes to *Fitzgerald* v. *Southern Railway Company,* 6 L. R. A. (N. S.) 337.

This is a correct announcement of the law on this subject, and as a matter of law, therefore, on the facts of this case, no assumption of risk nor contributory negligence can be charged to the deceased employee. It was the duty of the master to use every reasonable effort to see that the place in which these employees worked was safe, and they had a right to assume that this duty would be strictly complied with. Besides which, even if the doctrine of contributory negligence and the assumption of risk could be invoked, it is equally clear on the testimony which we have set out that whether the deceased employee was guilty of contributory negligence or as-

sumed the risk was a question of fact for the jury, and not for the court.

Keeping in mind the whole of the testimony which we have stated above, it is plain that this gas was escaping into the laboratory from Friday evening until the time of the explosion, 2 p. m. Saturday; that the chemist had his attention called to it several times, and made some perfunctory effort to have the situation remedied; that O'Brien, the employee of the gas company, and Burns, the assistant plumber, were there several times engaged in an effort to locate the leak and correct it; and, what is most significant of all, that Chambliss, the president of the defendant company, was asked by White if he did not smell the gas, and replied that it had been attended to; that his office had been telephoned about the escaping gas, and need for having it corrected, and, though he was not at the moment in the office, he came in just a few minutes afterwards; that he therefore knew himself, some time before the explosion, of the escaping of the gas, and, of course, the danger therefrom, and yet contented himself with doing nothing further about it than giving it this purely perfunctory attention. It is impossible to say, on any fair view of this testimony, taken as a whole, that the master complied with the strictness of the rules of law requiring him to use every reasonable precaution to see that the place of work was safe, and that there was not, therefore, such negligence shown as would take the case from the jury, whose peculiar duty it is to pass upon the facts as to whether contributory negligence existed, even if it could be invoked in a case based on the master's failure to supply a reasonably safe place in which to work. The peremptory instruction should not have been given.

*Reversed and remanded.*

PER CURIAM. The above opinion is adopted as the opinion of the court, and for the reasons therein indicated the judgment is reversed, and the cause remanded for a new trial.