## Adams *v*. Hicks.

(Division A.   Jan. 31, 1938.)

[178 So. 484.   No. 32919.]

Gilbert & Cameron, of Meridian, for appellant.

M. V. B. Miller, of Meridian, for appellee.

**McGowen, J.,** delivered the opinion of the court.

The appellee, Hicks, recovered a substantial judgment in an action for damages against Adams, administrator, from which judgment the latter prosecutes this appeal. The suit was originally brought against M. R. Adams, who died while the case was pending, and the cause was revived in the name of his administrator.

The contention of the appellant is that he was entitled to a peremptory instruction, and that, as a matter of law, the case should not have been submitted to the jury. M. R. Adams, in his lifetime, was engaged in the business of selling cattle, horses, mules, and hogs at public auction, in Meridian, Miss. He operated the Meridian Union Stock Yards, in a building where live stock were kept, for sale at auction. Hicks was employed by Adams to drive the stock from their stalls to and from the pen where they were sold at auction; it was also his duty to take up permits of stock sold, upon being carried out of the building by the owner. While engaged in driving some bulls south to the pen to be auctioned off, through an alley about twelve feet wide, horses were released in the alley about thirty-five feet south of where the bulls were penned. The horses rushed down upon the bulls, who were frightened, and turning, ran over the appellee, thereby seriously injuring him. It was a custom, approved by the manager and the owner, to receive all live stock at the north door or gate of the building. Horses were placed in pens south of the auction pen, facing what

is called the west alley; then there was an east alley of about the same width, with pens on either side. Although there was a gateway in the south of the building, it was the custom to keep that gate locked, and all live stock admitted into the building, or permitted to be taken out, passed through the north gate. 'As live stock came into the building, numbers or stickers were attached to them by the employees; they were then placed in pens substantially built of lumber, each with a gate opening into the alley; these gates being fastened by means of a wooden slide, which fastened into a slot in the post with which the gate connected. These pens were shown to be safely closed; the only way in which stock could escape therefrom was by some person sliding the bar, and opening the gate.

Both the owner and the manager knew that this method of conducting auction sales required quick action on the part of the employees in driving the stock to the auction pen when called on by the manager so to do. They also knew it was dangerous for horses and bulls to be allowed in the alley at the same time. The evidence for the plaintiff tended to establish that it was customary, while cattle were being driven from the north through the alley to the auction pen, for owners, employees and other people to turn horses loose in the alley; and that under their system, when live stock was bought at the auction sale it was returned to the pen, the owner was given a statement containing the number of his live stock; whereupon he went to the office, the bookkeeper calculated the amount to be paid by the purchaser, and, when so paid, the purchaser was given a permit which entitled him to remove his live stock from the building; the only exit provided being the north gate.

It was shown by the appellee that at some other stockyards locks were provided for the gates which confined the animals, so they could only be removed as and when the owner directed. There is a sharp conflict on this

point. The general manager of appellant testified that they had a rule among their employees that horses were not to be turned into the alley during the time that cattle and bulls were to be auctioned. It was a custom to auction horses and mules in the morning and until 1 o'clock in the afternoon; immediately thereafter the sale of bulls at auction was begun. The accident in which the appellee was injured occurred after 1 o'clock in the afternoon, while he was in discharge of his duty, driving the bulls to the auction pen, as he had been ordered to do by the manager.

In these stockyards were handled wild, unbroken horses, and vicious bulls. The record shows that on sale days permitting horses to be turned into the alley, where they came into conflict with bulls, created a complex and very dangerous situation.

Prior to this, accidents of a similar nature had occurred both to live stock and to human beings. On two occasions Hicks had requested the owner of the building to provide locks for the doors, so that horses would not be turned in upon him while engaged in driving the bulls—or to arrange some other safe method. It was evident that the use of locks on the gates, to confine the horses, would have been a cheap and safe precaution. The evidence further showed that horses and mules could have been driven out of the building by another gate, completely obviating his danger. Adams had acceded to Hicks' request to take measures to prevent further danger. It is admitted that under the system as practiced the owner and manager of the stockyards could not control purchasers of horses or mules, after the permit to remove them from the building had been issued; although the manager said they frequently requested the owners not to remove them while the cattle were on sale in the afternoon.

It is contended by the appellee that the evidence which we have set forth warranted the jury in finding that

Adams was negligent because of his failure to provide a reasonably safe place for the appellee to work; and that the verdict of the jury should settle all issues of fact in his favor.

Appellant contends that if the horses had been turned out by employees, that would have been the act of a fellow servant; that if turned out by purchasers or others, not employed by Adams, the latter would not be liable therefor. Appellant next contends that even if locks had been provided, it would have delayed delivery; and that the evidence showed that the gates, as used, were such as were in common use in other stockyards. In the third place it is contended that the danger was so open and obvious that Hicks assumed the risk, and that therefore there is no liability.

We think the jury were warranted in finding that the master or owner was negligent in this matter, and that the negligence consisted in a system, and the continuance thereof, which constantly created a dangerous place for an employee such as Hicks to work; that the master was aware of this danger, and had been requested to take steps to correct it—and had agreed to do so; that the master knew, and had reason to know, that the owners and other people could easily turn horses and mules out in the alley to mingle with bulls and cows. It is conceded that this constituted a dangerous situation.

It is not the duty of this court to prescribe a certain method by which an operation can be made reasonably safe; but it is our duty to declare that when the facts warrant a finding that the master has not exercised reasonable care to create a reasonably safe place in which a human being is to work, then negligence is established. See Edwards v. Haynes-Walker Lumber Co., 113 Miss. 378, 74 So. 284; Mississippi Cotton Oil Co. v. Ellis, 72 Miss. 191, 17 So. 214; Finkbine Lbr. Co. v. Cunningham, 101 Miss. 292, 57 So. 916; Murray v. Natchez Drug Co., 100 Miss. 260, 56 So. 330; McLemore v. Rogers, 169

Miss. 650, 152 So. 883; Eagle Cotton Oil Co. v. Pickett, 175 Miss. 577, 166 So. 764, and Ross v. Louisville & N. R. Co., 178 Miss. 69, 172 So. 752; also, Parlee Albert, Adm'r, v. Doullut & Erwin, Inc., Miss., 178 So. 312, decided by Division B, January 24, 1938.

Having concluded that the jury were warranted in finding that the master here did not exercise reasonable care to provide a reasonably safe place to work, the character of the work considered, then the servant did not assume the additional risk which said negligence proximately caused. Brown v. Coley, 168 Miss. 778, 152 So. 61, and McLemore v. Rogers, supra. We cannot agree with counsel for the appellant in his contention that because the master himself did not release the horses —for that matter it is not shown who did release them on this particular occasion—that therefore they were released by those over whom they had no control. In other words, that the release of the horses into the alleyway was the sole proximate cause of Hicks' injury. When we remember that it is the nondelegable duty of the master to exercise reasonable care to furnish a reasonably safe place in which the servant is to work, and he fails so to do, although he might reasonably have anticipated that such intervening cause would occur, in our opinion the original negligence continues; and the latter cause will not interrupt the connection between the original cause and the injury. In this case there is no question but that the master could easily foresee that any one who so desired could at any time set the horses at liberty in this alleyway; therefore, such action of a third party does not interrupt the connection between the original negligence of the master and the injury to the servant. Russell v. Williams, 168 Miss. 181, 150 So. 528, 151 So. 372, and Ross v. Louisville & N. R. Co., supra. The master did have control of the system, so that when he delivered a permit to a purchaser of live stock, that per-

son was not restricted in the manner of, or time for, removing his property from the building.

We think it would be profitless to wander through the authorities cited as applying to this case, where the principles here involved have been analyzed and applied so long and so often.

Affirmed.