PROVIDENT LIFE & ACCIDENT INS. CO. *v*. CHAPMAN.

(Division B. Oct. 22, 1928. Suggestion of Error Overruled Dec. 3, 1928.)

[118 So. 437. No. 27104.]

748

*Corpus Juris-Cyc References: Accident Insurance, 1CJ, section 209, p. 482, n. 15; Trial, 38Cyc, p. 1721, n. 50 New; Witnesses, 40Cyc, p. 2381, n. 27; p. 2383, n. 35; p. 2387. n. 69; As to admissibility of evidence of facts learned because of relation of physician and patient, see 28 R. C. L. 535; 4 R. C. L. Supp. 1828.

*C. M. Wright*, for appellant.

750

*Martin Miller*, for appellee.

ETHRIDGE, P. J. The appellee, plaintiff in the court below, brought suit on an insurance policy issued by the appellant, defendant in the court below. The policy provided for indemnity for disability because of personal bodily injury suffered during the life of the policy through external, violent, and accidental means, and for the recovery of a specific indemnity for the loss of the sight of one eye, or the loss of the sight of both eyes. The policy provided for a monthly accident indemnity of eighty dollars because of disability resulting from such personal bodily injury, the monthly indemnity to cease upon the happening of one of the specific losses named in the policy.

The principal sum of such policy was one thousand dollars, and the specific indemnity covering the loss of one eye because of such personal bodily injury is one-half the principal sum, and that covering the loss of both eyes is double the principal sum.

The declaration alleged the contract of insurance; that it was in force on the 9th day of October, 1926, because the plaintiff on that date got a hot cinder in one eye, causing inflammation of that eye, and, through sympathy, inflammation of the other eye, thereby incapacitating him as a locomotive fireman, and finally resulting in the total loss of the sight of both eyes within the one-hundred-and twenty-day limit stipulated in the policy.

The defendant pleaded the general issue, and gave notice thereunder, to the effect that the policy provides for indemnity for the loss of plaintiff's eyes only when the said loss is irrecoverable, and only when the said loss results solely from bodily injuries sustained through external, violent, and accidental means, and only when the loss results within the one hundred and twenty days of the happening of such injury; that plaintiff sustained no personal injury or injuries resulting solely from external, violent, and accidental means, within one hundred and twenty days from the loss of his eyesight, and that the said loss did not result from an injury sustained by him within one hundred and twenty days of such loss; that plaintiff did not lose his eyesight because of any personal bodily injury suffered by him, but that he lost his eyesight from disease, or from natural causes, and that he had been going blind for a long time; that on November 19, 1926, the defendant compromised and settled all claims with the plaintiff under said policy for the sum of one hundred and fifty dollars, at the special instance and request of the plaintiff, and that plaintiff receipted the defendant in full, for all demands under said policy, and surrendered the same; that the said policy provides that claims for any loss must be filed within ninety days from the happening of such loss, together with affirmative proof thereof, and that no proof of loss was filed as contemplated by the policy, and that no suit may be brought within sixty days after such proof.

The plaintiff replied to this notice under the general issue, and, in support of his declaration, testified that he was a fireman in the employ of the New Orleans & Northeastern Railroad Company, and had been for some twenty-seven years, but that in October, about the first part of the month, he received an injury to his eye by means of a hot cinder getting into and injuring it; that for the first few days after the said injury he continued his employment, and that his wife treated his eye by bathing it at night, but that about the 9th of October he had to abandon his employment; that he had his eyes examined and treated, but that they became worse, and, some time early in December, he lost his eyesight entirely. He admitted that he had received a check from the insurance company for one hundred and fifty dollars, which he had credited on the amount of his suit, but stated that he did not understand at the time the check was given him; that it was intended by the insurance company as a full and complete settlement for his injury; that the agent of the company came out to his house after he had been stricken with blindness and could not read, and stated to him that he had brought him a check, the amount of which was in liquidation of his disability benefits for the time past, as well as two weeks advance, dating from that date by which time the said agent stated he had been informed Chapman would be ready to return to his employment. He stated that the agent of the insurance company did not read the check nor the release to him; neither did he state that the check was a settlement in full for his injury. He stated that he signed the release by having his son write his name thereon, without it having been read to him, with the understanding and in the belief that it was a mere payment of the weekly disability benefits.

The plaintiff is supported in his testimony in this regard by certain members of his family. He is further supported in his evidence that he was blind by the testi-

mony of a groceryman who lived near by, as well as by some of his neighbors.

The plaintiff also testified that prior to his injury his eyesight was good; and he is corroborated in this by some of his neighbors, who testified that they had not observed anything wrong with his sight prior to the injury, but had often seen him reading, and knew that nothing was wrong with his eyesight prior to that time.

The defendant offered the agent who made the alleged settlement as a witness. This witness testified that it was understood that the check was in full settlement of the plaintiff's injury; that he took up the policy, and that the plaintiff understood the terms and agreements contained in the instrument of release; and this witness is corroborated by another party who witnessed the signing of the alleged release by the plaintiff.

The defendant also introduced several witnesses, who were employees of the New Orleans & Northeastern Railroad Company, and who, through their employment, were associated with the plaintiff in his work. These witnesses testified that the plaintiff had received some injury in March, 1926, preceding this claimed injury, and that plaintiff's eyesight had been defective for some time before he quit the employ of the railroad, or was laid off. They testified that he had failed to distinguish the signals given; that they were working with him during the time he worked after the alleged injury, but that they saw no inflammation in his eyes then, and heard no complaint from him that he had received such injury.

It was also in evidence by a witness for the defendant, that the plaintiff was sent to Dr. J. E. Seale, an eye specialist, for examination of his eyes, about the 9th of October, and that the report of said examination indicated defective eyesight—inability to distinguish colors. The plaintiff himself, on cross-examination, testified that he was examined by Dr. Seale for color-blindness.

Dr. Seale was called as a witness for the defendant. His testimony was objected to, and the objection was sustained as to what he discovered by his examination of the plaintiff's eyesight. His testimony was taken before the court in the absence of the jury, and showed that he made the examination for color-blindness, and that the plaintiff's eyesight was bad; that he saw no inflammation at the time he made the examination, nor any evidence of an external injury; that his examination convinced him that plaintiff's blindness was caused by constitutional weaknesses or diseases. Dr. Seale was permitted to testify as an expert, and, in answer to certain hypothetical questions embracing hypotheses supported by the defendant's testimony, testified that, assuming the hypotheses to be true, the injury was not caused by external injuries.

The evidence of Dr. Arnold and of Dr. Mosby, other eye specialists at Meridian, was offered. Dr. Arnold had treated Chapman, at intervals, from about the 15th of October to the 1st of November, and testified that he saw no inflammation in plaintiff's eyes during the time he was treating him, and no evidence of recent external injury, but that he found scar tissue, indicating previous external injury.

It further appeared that the plaintiff was examined by Dr. Touchstone, another eye specialist, who found what he termed a "peculiar condition" of his eyes, and called Dr. Mosby, another eye specialist who occupied an office adjoining Dr. Touchstone's, and Dr. Mosby, after examining plaintiff's eyes, admitted that the "peculiar condition" found by Dr. Touchstone did exist.

Dr. Mosby was offered as a witness, and, in the absence of the jury, testified to the facts above stated, and stated, also, that he was not solicited by the plaintiff to make an examination of his eyes, and did not, as he understood it, occupy a professional relationship to him at that time.

These physicians, as above stated, were not permitted to testify as to the facts learned by means of these observations, nor as to the treatments given the plaintiff's eyes, but were permitted to testify as experts, to answer hypothetical questions propounded, assuming the hypotheses supported by the state's evidence to be true; and they testified, in response to such hypothetical questions, that the injury was not in their opinion, caused by external injury received at the time testified by the plaintiff.

Dr. Bounds, another eye specialist, examined plaintiff's eyes about ten days before the trial, and testified that he found a laceration or puncture of the cornea—a scar tissue all over the cornea, which, in his opinion, was caused by an external injury, and was not due to constitutional causes or diseases.

There was a verdict and judgment for the plaintiff, from which this appeal is prosecuted.

Appellant first argues the issue of fraud involved in the signing of the release, and contends that the proof is insufficient to show a fraudulent procurement of the release, and that the defendant should have had a peremptory instruction upon that ground.

We are unable to agree with this contention. The plaintiff's testimony shows that the agent of the appellant came out to his home at a time when he could not see how to read, and stated to him that the voucher which he presented to him for his signature was a settlement for the weekly disability indemnity already accrued, and for two weeks in advance, by which time the agent thought Chapman would be able to resume work. It is true that the agent of the company and the witnesses for the company contradicted this statement of plaintiff's but other witnesses corroborated the statement of plaintiff, and we think it was a question for the jury to determine on this conflict of evidence,

Where a person is unable to read, and therefore unable to protect himself by his own sight and diligence, he must necessarily rely upon the statements of others as to what an instrument presented to him contains. There was no negligence here on the part of the plaintiff in failing to read the release. He had a right to rely upon the statements made to him, assuming that such statements were made, which the jury found by its verdict necessarily to be a fact. So we think this assignment of error is not well taken.

We think, also, that it was not error to exclude the testimony of the physicians as to examinations made by them. We regard the question here presented as being settled by previous decisions of the court, with the exception of the testimony of Dr. Mosby. See *Davis* v. *Elzey*, 126 Miss. 789, 88 So. 630, 89 So. 666; *U. S. F. & G. Co.* v. *Hood*, 124 Miss. 548, 87 So. 115, 15 A. L. R. 605; *Newton Oil Mill* v. *Spencer*, 116 Miss. 568, 77 So. 605; *Yazoo & M. V. R. Co.* v. *Messina*, 109 Miss. 143, 67 So. 963. While these cases do not specifically mention, in passing upon the testimony, the Elzey and the Hood cases, yet the fact was involved, because physicians accompanied the regular physician in each of the cases at the time the examination was made. We think when a physician is called to treat a patient, and he finds a condition which he regards as unusual or abnormal and calls another physician for the purpose of observing this condition, that he is the agent of his patient in doing so, and that he does so for the reason, we must presume, that he desires additional medical opinion to his own in dealing with the situation. The patient, in such case, would not be expected to protest, or object to an examination made under such circumstances, and we think the policy of the statute would be best promoted by leaving the physician free to secure additional medical opinion for the benefit of the patient, and that his act would be attri-

buted to the patient in inviting other medical aid for consultation. It is immaterial whether the fee was paid or charged. The knowledge which Dr. Mosby obtained was obtained at the solicitation of the plaintiff's agent and physician. We are therefore of the opinion that there was no error in excluding this medical evidence.

The courts are not concerned with the wisdom, or lack of wisdom, of legislative enactments. We must presume that the legislature was sufficiently moved by consideration for the public welfare, to enact the statute, and we should treat the statute so as to carry out the legislative policy. It we should hold that a person being treated by a physician would waive the benefit of the statute as to his physicians, who were present and taking some part in the examination, we would make it always possible to defeat the purpose of the statute by the simple expedient of a doctor inviting others of his profession to examine a patient out of mere consideration of curiosity.

The defendant requested the following instruction:

"The court charges the jury for the defendant that the settlement by the defendant with Sandy Chapman, and the taking from him of a release of all liability of the defendant to him under the policy in evidence, and the surrender of such policy by the plaintiff to the defendant, constitutes a contract of release and under the terms of such policy, unless you further believe from a preponderance of the testimony that the defendant imposed upon, overreached and defrauded plaintiff in such settlement with full knowledge that the plaintiff had received injuries, and that such injuries would likely result in the loss of his eyes; and that such contract of release and satisfaction evidenced by the draft and release and surrender of the policy is a contract that should be construed under the law of this state; and the burden of proof is upon the plaintiff as to each and every element or circumstance of fraud necessary to show that such settlement is not fairly made and concluded."

The court modified this instruction to read as follows:

"The court charges the jury for the defendant that the settlement by the defendant*with Sandy Chapman, and the taking from of a release of all liability of the defendant to him under the policy in evidence, and the surrender of such policy by the plaintiff to the defendant, constitutes a contract of release and satisfaction for all liability of the defendant to the plaintiff under the terms of such policy, unless you further believe from a preponderance of the testimony that the defendant imposed upon, overreached and defrauded plaintiff in such settlement with full knowledge that the plaintiff had received injuries; that such contract of release and satisfaction evidenced by the draft and release and surrender of the policy is a contract that should be construed as other contracts are construed under the law of this state; and the burden of proof is upon the plaintiff as to each and every element or circumstance of fraud necessary to show that such settlement was not fairly made and concluded."

It is complained that there is omitted from the instruction as modified, the following language, "And that such injuries would likely result in the loss of his eyes," and that the defendant was entitled to have the instruction given as requested; that knowledge by the defendant's agent that plaintiff would likely lose his eyesight was and is the necessary element of fraud.

We do not think the court committed error in its modification of the instruction. It is immaterial whether plaintiff had knowledge, in making the settlement, that the injury would likely result in the loss of the eyesight or not. If he knew that the plaintiff could not see or read the release, and made the representation which the plaintiff says he made, the defendant could not make the representation that the settlement was to cover weekly disability benefits for a given period, when it knew that the

contract, as written, covered every kind of release under the policy. The law requires fair dealing in cases of this kind; and it is not permissible to deceive in a material particular the opposite party to the contract.

There are numerous assignments of error predicated upon the giving of instructions for the plaintiff and the refusal of others requested by the defendant. We have examined them, and think the instructions given announce the law fully and fairly as it relates to the matters embraced in the pleadings and the evidence.

It is assigned for error that the court erred in refusing to permit the defendant to prove by the plaintiff what the physicians who examined him said to him about his condition. We think it was not permissible to do so.

We find no reversible error, and the judgment is affirmed.

*Affirmed.*

