KEETON *v.* STATE.

(In Banc.   April 6, 1936.)

[167 So. 68.   No. 31931.]

J. Morgan Stevens and J. M. Stevens, Jr., both of Jackson, and Frank Clark, of Waynesboro, for appellant.

636

**W. D. Conn, Jr.,** Assistant Attorney-General, for the state.

Argued orally by **J. M. Stevens, Jr.**, for appellant, and by **W. D. Conn, Jr.**, for the state.

**Anderson, J.**, delivered the opinion of the court.

Appellant was jointly indicted with W. M. Carter for the murder of her mother. There was a severance, and the trial of appellant alone, resulting in a verdict of guilty, and sentence to the penitentiary for life. From that judgment, she prosecutes this appeal.

We see no good purpose to be served by setting out the horrible and gruesome evidence going to show the murder. It was ample to sustain the verdict against appellant, and furthermore to show that the murder was committed by her alone, without the assistance of Carter or any one else. However, there was sufficient evidence,

if her confession is believable, to go to the jury on the theory that the murder was committed as the result of a conspiracy between appellant and Carter, the latter doing the actual killing. The conspiracy theory is supported by her confession alone, while her separate and independent guilt was sufficiently shown by outside evidence, in connection with her confession.

Appellant assigns as error the action of the court in putting her to trial when she was physically unable to advise her counsel and testify as a witness in her own behalf, and in not inquiring into her mental condition before doing so. These two specifications of error are argued together. The facts are that appellant was brought into court for the purpose of arraignment. Her counsel objected to arraignment at the time because of her "physical condition," stating that it would be dangerous to her health to do so, and that on account thereof they had been unable to see her, and converse with her about the case. Thereupon the court dictated into the record that on that morning he had called into conference both counsel for the state and for the appellant, and also four physicians, among whom was Dr. Jarvis, appellant's attending physician; that these four physicians were requested, in the presence of appellant's counsel, to proceed to the hospital in which appellant was an inmate, and make a thorough examination of her for the purpose of ascertaining whether or not it would be safe to bring her into court at that time for the purpose of arraignment only; that no objection was made by appellant's counsel to this course; that the physicians accordingly made the suggested physical examination, and reported in writing to the court that they had done so carefully, and in their opinion appellant could be brought to court and arraigned without danger to her health; and that thereupon the court directed appellant to be brought into court for the purpose of arraignment only. After this statement by the court, she was arraigned,

and stood mute, and the court then caused a plea of not guilty to be entered. After the arraignment, appellant's counsel offered to prove by bystanders that she was physically unable to be arraigned. The court refused to permit this. There was no error in the procedure adopted by the court; it is supported by Lipscomb v. State, 76 Miss. 223, 25 So. 158. It was held in that case that the defendant was not entitled to postponement or continuance of his case merely because he made affidavit, and procured physicians to join him therein, stating that owing to his mental or physical condition, or both, he was unable to endure the ordeal of a trial or to properly conduct his defense; that such matters of fact could be controverted by the state; and that such an application was even more largely addressed to the sound discretion of the court than when based on other grounds.

No suggestion was made to the court that appellant was incapable of arraignment and trial because she was insane. It was upon her physicial condition alone that the court was called upon to act. After the arraignment, appellant's counsel withdrew her application for continuance, and made a motion for severance, which was granted. Motion was then made for a special venire, which was sustained. If it had been suggested, or appeared to the court, that appellant might be insane, it was the duty of the court to inquire into and determine whether that was true or not, and, if true, to delay the trial until her sanity was regained. Hawie v. State, 125 Miss. 589, 88 So. 167. But there is nothing in the record that shows or tends to show that at that time appellant was insane, or that her main defense would be insanity at the time of the homicide. In Davis v. State, 151 Miss. 883, 119 So. 805, the court held that the defendant should have presented to the court the affidavit of witnesses to prove his present insanity or inability to conduct a rational defense; that a mere motion of de-

fendant's counsel was not sufficient to require the court to halt the trial and conduct a preliminary inquiry.

Appellant's confession is attacked upon two grounds; that it was not freely and voluntarily made, and that the corpus delicti was not sufficiently proved to admit it. Mrs. Keeton was killed between Saturday afternoon, January 19, 1935, and the next Monday morning, January 21, before eight o'clock. Appellant was arrested on Friday the 25th. After her arrest, and during the balance of that day, and most of the night, she was questioned by different ones, principally officers, concerning her connection with the homicide. The confession, howere, which was introduced in evidence was made the following Sunday, while appellant was in jail. On the preliminary inquiry by the court as to whether the confession was free and voluntary, the witnesses present testified that it was; that neither was duress exercised, nor hope of clemency promised her. The court held that the evidence was competent and admitted it. Appellant argues that the long and persistent grilling amounted to duress. A confession in other respects admissible is not rendered incompetent because it was not the spontaneous utterance of a prisoner. The fact that the confession was obtained by persistent questioning is not sufficient alone to exclude it if the confession emanates from the free will of the accused and without the inducement of hope or fear. Underhill's Criminal Evidence (3 Ed.), sec. 232. The finding of the court that the confession was free and voluntary will not be disturbed unless it appear that such finding was manifestly contrary to the weight of the evidence. Brown v. State, 142 Miss. 335, 107 So. 373; Stubbs v. State, 148 Miss. 764, 114 So. 827; Buckler v. State, 171 Miss. 353, 157 So. 353.

The corpus delicti was sufficiently proven in order to admit appellant's corroborating confession. Where there is a confession of guilt by the defendant, the law only requires that the corpus delicti be established to

a probability, and where the two taken together establish the corpus delicti beyond a reasonable doubt, that is sufficient. The principle is stated thus in Heard v. State, 59 Miss. 545: ''Where there has been a confession by the accused, much slighter proof is required to establish the corpus delicti than would be necessary where the State must make out the entire case, unaided by a confession. Any corroborative proof in such a case will be held sufficient which satisfies the mind that it is a real and not an imaginary crime which the accused has confessed, and the fact that he was the guilty party may be found by the jury, on proof much slighter than that ordinarily essential.'' This rule has been followed in Nichols v. State, 165 Miss. 114, 145 So. 903; Walker v. State, 127 Miss. 246, 89 So. 921; Patterson v. State, 127 Miss. 256, 90 So. 2; Garner v. State, 132 Miss. 815, 96 So. 743; Crabb v. State, 152 Miss. 602, 120 So. 569; Pope v. State, 158 Miss. 794, 131 So. 264; Perkins v. State, 160 Miss. 720, 135 So. 357; Whittaker v. State, 169 Miss. 517, 142 So. 474.

It is assigned and argued that the court erred in overruling appellant's application for a subpoena duces tecum directed to the district attorney and county attorney and one Jourdan, requiring them to produce certain written confessions alleged to have been made by appellant for inspection by appellant's counsel. There is no merit in this contention. The application for the subpoena should have set out the substance of what was expected to be proven by the confessions. This was not done. Eaton v. State, 163 Miss. 130, 140 So. 729; Stevens v. Locke, 156 Miss. 182, 125 So. 529.

Appellant's defense was insanity. She introduced evidence both lay and expert to sustain that defense. The state likewise introduced lay and expert testimony to show sanity. The state introduced, over appellant's objection, Drs. Fenno, Holbrook, Barrentine, Oates, Beach, and Ramsey, who testified that in their opinion she was

sane at the time of the homicide and at the time of the trial. Objection to their evidence was upon the ground that their testimony concerning appellant's mental condition was privileged, and therefore not admissible under the privileged communications statute, section 1536, Code of 1930.

The majority of the court hold that the statute applies to criminal as well as civil cases, except in Maddox v. State, 173 Miss. 799, 163 So. 449, it was held that the statute had no application to the testimony of the physician of the victim in a murder case. The writer is of the opinion that the statute has no application to criminal cases. His views to that effect were embodied in an opinion in response to the suggestion of error in Davenport v. State, 143 Miss. 121, 108 So. 433, 45 A. L. R. 1348. Furthermore, he is of the opinion that where the subject-matter of the privileged communication is made an issue in the case (whether civil or criminal), and the party making it an issue divulges the matter by introducing one or more of his physicians, the ban of secrecy is lifted—the confidential matter is thereby published to the world, and the way is opened for the other side to go into the question in the same way. Such action constitutes a waiver. The true rule is stated thus by Wigmore on Evidence (2 Ed.), Vol. 5, pp. 220, 221, sec. 2389:

"(1) In the first place, the bringing of an action in which an essential part of the issue is the existence of physical ailment should be a waiver of the privilege for all communications concerning that ailment. The whole reason for the privilege is the patient's supposed unwillingness that the ailment should be disclosed to the world at large; hence the bringing of a suit in which the very declaration, and much more the proof, discloses the ailment to the world at large, is of itself an indication that the supposed repugnancy to disclosure does not exist. If the privilege means anything at all in its origin,

it means this as a sequel. By any other conclusion the
law practically permits the plaintiff to make a claim
somewhat as follows: 'One month ago I was by the de-
fendant's negligence severely injured in the spine and
am consequently unable to walk; I tender witnesses A,
B, and C, who will openly prove the severe nature of my
injury. But, stay! Witness D, a physician, is now, I
perceive, called by the opponent to prove that my injury
is not so severe as I claim; I object to his testimony be-
cause it is extremely repugnant to me that my neighbors
should learn the nature of my injury, and I can keep
it forever secret if the Court will forbid his testimony.'
If the utter absurdity of this statement (which is virtual-
ly that of every such claimant) could be heightened by
anything, it would be by the circumstance (frequently
observable) that the dreaded disclosure, which the privi-
lege prevents, is the fact that the plaintiff has suffered
no injury at all! The privilege under these circum-
stances becomes a burlesque upon logic and justice.''

The decisions of our court to the contrary, the writer
thinks, ought to be overruled; the construction they put
upon the statute comes dangerously near, in a civil case,
violating, if it does not actually do so, the equal protec-
tion clause of the Federal Constitution (Const. Amend.
14, sec. 1). Applying the rule, however, to which the
majority of the court adhere, the relation of physician
and patient did not exist between appellant and any of
the physicians introduced by the state, except Dr. Ram-
sey. The action of the court in admitting his testimony
will be considered separately. The other physicians ex-
amined appellant with the view of ascertaining and tes-
tifying in the trial as to whether she was sane or in-
sane; they were requested to do so either by officers
representing the state or by counsel; their examination
had nothing to do with the treatment of appellant as
physicians. It was held in Norwood v. State, 158 Miss.
550, 130 So. 733, that where a physician, by direction

of the court, or an officer of the court, makes an examination of the physical or mental condition of a defendant, without objection, the relation of physician and patient does not exist, and therefore "the privilege of the statute does not arise." The principles laid down in that case are controlling here. We have here the verdict of the jury, supported by both lay and medical testimony, that appellant was capable of consenting to the examination.

When Dr. Ramsey was called as a witness by the state, appellant's counsel objected to his testifying in this language: "If the court please we want to renew our objection to the testimony of this witness for the same reason that we objected to the testimony of Dr. Holbrook and Dr. Fenno." As above shown, the relation of physician and patient did not exist between either of those physicians and appellant. The objection was overruled. Dr. Ramsey then testified that he was the physician of appellant's mother's family, although he had never treated appellant; that he had sustained that relation for fifteen years or more; that he had often seen and observed appellant during those years—her demeanor, conduct, and the expression of her face—and his opinion was that she was sane. He also testified that after the homicide he visited her in jail and in the hospital as her physician and treated her as such; in other words, he clearly showed that during that time the relation of physician and patient existed. Based on what he learned then, he testified that in his opinion appellant was sane at the time of the homicide and since. The privileged communication statute has no application to what Dr. Ramsey learned by his association with and observation of appellant before the homicide; it applies alone to knowledge acquired as the result of the relation of physician and patient. In Estes v. McGehee, 133 Miss. 174, 97 So. 530, testamentary capacity was involved. The court held that the statute did not preclude a physician from testifying to facts and circumstances derived from business

and social relations existing between him and the testator, segregated from the relation of physician and surgeon. It was held in Watkins v. Watkins, 142 Miss. 210, 106 So. 753, that the testimony of a physician as an expert in answer to a hypothetical question based on testimony of lay witnesses as to the mental condition of a testator is not objectionable on the ground of privilege, although the witness had at a time prior to that in question been the testator's physician. Appellant's counsel interposed no other objection, either during the progress of the testimony of Dr. Ramsey or at its conclusion, looking to a separation of the competent evidence and the incompetent. The objection made was directed to the whole of it. The court was never given an opportunity to make the separation.

The person claiming the privilege must show that the relation of physician and patient existed, and must show, further, the existence of all the conditions of exclusion. "The burden is upon one claiming privilege to show the existence of conditions entitling him to insist upon the exclusion of the proposed testimony." 10 Ency. Evidence, p. 157. Objection to the admission of evidence must be specific. A general objection thereto, which was overruled, will not be considered on appeal, unless on the face of the evidence in its relation to the rest of the case there appears no purpose whatever for which it could have been admissible. Bessler Movable Stairway Co. v. Bank of Leakesville, 140 Miss. 537, 106 So. 445.

The court permitted the state, over the appellant's objection, to make profert to the jury and identify certain parts of the body of Mrs. Keeton. Appellant argues that that action of the court was calculated to unduly prejudice the jury against her. It devolved on the state to prove that Mrs. Keeton was dead. The evidence in question was offered for that purpose. We think it was competent. Underhill's Criminal Evidence (3 Ed.), sec.

101; Self v. State, 90 Miss. 58, 43 So. 945, 12 L. R. A. (N. S.) 238.

Appellant assigns as error the action of the court in admitting evidence of fatty substances, shoes and stockings, and blood stains found in the home of Mrs. Keeton. This evidence was admitted as tending to show not only the corpus delicti, but the criminal agency of appellant. It was competent for that purpose. Hunter v. State, 137 Miss. 276, 102 So. 282.

Appellant argues that the conspiracy instruction given for the state was error under the principles laid down in Rich v. State, 124 Miss. 272, 86 So. 770. It was held in that case that it was reversible error to give an instruction authorizing a conviction upon the ground of conspiracy where there was no proof of such conspiracy. That is not true of the present case. There was evidence here tending to show that appellant and Carter conspired together to take the life of Mrs. Keeton, and that Carter committed the actual killing. Although the evidence of such a conspiracy is weak and uncorroborated, still it was a question for the jury.

We are of the opinion that no harmful error was committed by the court in the giving of instructions for the state, or the refusing of instructions for appellant, and that the assignments of error based thereon are not of sufficient seriousness to call for a discussion by the court.

Affirmed.

### DISSENTING OPINION.

**Ethridge, J.,** delivered a dissenting opinion.

I dissent from the affirmance of this case with extreme reluctance. The appellant was indicted, tried, and convicted of the murder of her mother and the dismemberment of her body. The crime here charged is so horrible

in conception, so iniquitous in outline, so damnable in detail, so inhuman and fiendish in execution, as to leave one no choice except to elect between insanity and total human depravity. The defense is insanity, and the evidence to sustain the defense is abundant, cogent, and convincing, and rises, in my opinion, above a mere probability. Personally I am of the opinion that it overwhelms the evidence for the state to the effect that she was sane. Yet there was evidence tending to show sanity, from which it was possible, if believed by the jury, would support a finding of sanity; and if there were no other error, I would not reverse on the sole ground that the evidence was insufficient to sustain the verdict.

There are several major propositions relied on for reversal, and many of a lesser nature. It is contended that the corpus delicti was not proved aliunde the alleged confession, and that the alleged confession was improperly admitted, and that the court erred in permitting parts of the body, consisting of the upper parts of the legs and lower torso of a white woman to be introduced in evidence and exhibited to the jury. It is contended that the court should not have placed the defendant on trial at all, because of incapacity on her part to undergo a trial. Numbers of minor errors are assigned in relation to the exclusion, and the admission, of evidence, and in the instructions. In my opinion the evidence was sufficient aliunde the confession to show that probably the person alleged to have been killed, Mrs. Daisy Keeton, was in fact killed. Without the confession, and applying the rules relating to circumstantial evidence (which was the only evidence apart from the confession to prove the corpus delicti), the evidence would not exclude every reasonable hypothesis or theory other than that the said person was feloniously killed. The details of the evidence are numerous, and when put together lead to the conclusion that the appellant was probably the person who committed the crime. The majority opinion does

not set out these details, and they are so numerous that I shall not do so in this dissent.

I think it was error to admit the alleged confessions. I am embarrassed to comment on this phase of the case because of the high professional and personal character of the county and district attorneys and the circuit judge, whose friendship I value, and on account of the unfavorable position in which its recital places the state before the civilized world, as practicing medieval methods in securing confessions; but I feel that to acquiesce in the methods used would be for me to play the part of Benedict Arnold to official duty and legal justice.

The deceased, or Mrs. Daisy Keeton, was last seen on the afternoon of the 19th of January, 1935. On Monday morning following, the 21st, about eight-twenty-five, a person traveling in the direction of Laurel on highway No. 11 came upon the appellant, Ouida Keeton, whom he then did not know, walking along the highway in the cold and rain. She waved this witness down and secured a ride in his car to Laurel, giving as her reason for being out that she was taking some person to some place, and that her car was stuck. She first asked to go to the nearest telephone, which was at Sandersville, north of Laurel; but when she reached there decided that she would go on to Laurel, and was put out at her home in that city. She thereupon went to a garage, obtained a helper, and went out to the place where her car was stuck. Her explanation there was similar to that given the traveler with whom she rode to Laurel. On the same day, and shortly after the car was moved, part of the body of a white woman, from the knee to the umbilicus, severed into halves, was discovered near the place where this car had been situated. This was carried into Laurel, and placed in an undertaker's establishment. The appellant was seen by other persons near the place where these parts of the body were found. Nothing was done, however, in the

way of making an arrest until Friday morning, when the chief of police, the county attorney, and the deputy sheriff went to the home of appellant, where she and her mother had been living; and the chief of police asked to see her mother, and was told that she had gone to New Orleans, and that appellant had a letter that day from her, but was unable to produce it. The chief of police thereupon inquired whether he might look in the house and make an investigation. This he was allowed to do, and he there found blood spots in various places, some soiled stockings, and evidences of burned bones in the grate, with fatty substances on and under the hearth, indicating that some kind of flesh had been destroyed by fire. Other things were found, and the appellant was then carried to the county attorney's office between nine and ten A. M. on Friday the 25th, and kept in the office under constant grilling and questioning until between four and five o'clock the following morning. She was then returned to jail, and twice on Saturday the district and county attorneys and other officers questioned her. On Sunday the questioning was repeated, and about dusk, between daylight and night, they testified that she made the confession which was introduced in evidence, in which she implicated one Carter as being the person who killed her mother and destroyed parts of her body; and that she took the dismembered parts of the body found as above mentioned, for the purpose of secreting or destroying them. She also stated in the alleged confession that they had conspired, some months before to commit the crime, giving as the reason "that she might have more privileges."

It appeared, on the examination of the chief of police as to the admissibility of this confession, that she had made some similar confession, or some confession, during the period when she was kept in the county attorney's office. It also appeared that there were numerous persons who were in and around the office, and that only

the county attorney, the district attorney, the deputy sheriff, the chief of police, and a portion of the time a sister of the appellant who lived in New Orleans, were in that room. A brother of the appellant testified that he was in the room a part of the time, and that at other times he was excluded. Newspaper reporters testified that they heard talking in the room, but could not understand much of what was being said, but that they could hear appellant's voice in a loud and excited tone part of the time, and at other times could not hear what was said by her and the others. It was shown by the reporters, or one of them, that when the sister who came from New Orleans in response to a telephone call arrived at the said office, that the appellant said to her, in effect, that, "They are accusing me of killing my mother, and you know I didn't do it." It is also shown that during this period, when the appellant was in the county attorney's office, she had neither rest nor sleep, and only a little coffee and coca-cola were sent to her, with possibly a sandwich; and that she was continuously questioned during that period.

It appeared in the course of the trial that a stenographer was taken into the county attorney's office, and took numerous statements of the appellant in shorthand, totaling something like eighty-six pages of typewritten matter. Attorneys for the appellant tried to secure the production of these papers, but were denied the right to have the use of them. During the time when the appellant was in the office of the county attorney, and when she was in jail, prior to, and up to the time the alleged confession introduced in evidence was taken, she had no counsel. On cross-examination the chief of police was questioned as to the appearance of the appellant, and his knowledge of her, and his opinion as to her sanity; and he stated that it was his opinion, from the nature of the crime and the circumstances developed, that she was

insane. Confessions must be the utterances of a sane mind. Lipscomb v. State, 75 Miss. 559, 23 So. 210, 230.

The appellant, through her attorneys, did not on preliminary hearing introduce the medical testimony as to her insanity, which was afterwards introduced on the trial.

It is difficult for me to understand how a confession obtained under the circumstances, when the appellant was not allowed to rest or sleep from ten A. M. Friday until between five and six A. M. Saturday, could be termed free and involuntary. It must be remembered that the appellant was a young woman without counsel, charged with the murder of her mother, in the hands of the officers of the law, and persistently questioned. It seems to me that this method is no less torture than many other methods of obtaining confessions which are condemned. The law does not contemplate that such confessions would be used. To make a confession admissible, it must be free and voluntary. This is not a case of the mere occasional asking of questions by officers or others seeking explanation of a crime, to learn whether the defendant had any knowledge of it; this was a continuous process of extorting a confession through questioning and argumentation sufficient to break the nerve and morale of any ordinary person, and especially of one who is, as the appellant is shown to be, in bad health and of a nervous temperament, and who had been losing weight for six months, and manifesting peculiarities which indicated insanity.

It is sought to obviate this sweat box process, continued from Friday until Sunday, by showing that at the time the confession introduced in evidence was made, she was told that any statement she made would be used against her, and that she did not have to make such statement. It was the duty of the court and of the state on preliminary hearing to produce the facts as to what happened prior to the obtaining of the alleged confession,

and during that time. If there is a reasonable doubt of the admissibility of the confession, it should be excluded. The court should have gone more fully into the facts, and should have required the county and district attorneys to show what did happen, and all that did happen, during the time the appellant was under arrest in the county attorney's office. She was in a room in said office for long hours, with the officers of the law, without having counsel, and much of the time without friends. Her brother was excluded part of the time, he says. Her sister was sent for several hours after she had been taken into custody. But both brother and sister were greatly concerned to find the whereabouts of the mother. If on preliminary hearing by the court there is a reasonable doubt as to whether a confession was free and voluntary, it must be excluded from the jury. Ellis v. State, 65 Miss. 44, 3 So. 188, 7 Am. St. Rep. 634; Williams v. State, 72 Miss. 117, 16 So. 296; State v. Smith, 72 Miss. 420, 18 So. 482; Whip v. State, 143 Miss. 757, 109 So. 697; Ammons v. State, 80 Miss. 592, 32 So. 9, 18 L. R. A. (N. S.) 768, 92 Am. St. Rep. 607; Whitley v. State, 78 Miss. 255, 28 So. 852, 53 L. R. A. 402; Reason v. State, 94 Miss. 290, 48 So. 820; Mackmasters v. State, 82 Miss. 459, 34 So. 156; Jones v. State, 133 Miss. 684, 98 So. 150; Fisher v. State, 145 Miss. 116, 110 So. 361; Clash v. State, 146 Miss. 811, 112 So. 370; White v. State, 129 Miss. 182, 91 So. 903, 24 A. L. R. 699; Johnson v. State, 107 Miss. 196, 65 So. 218, 219, 51 L. R. A. (N. S.) 1183, where it is said: A voluntary confession is one "proceeding from the spontaneous operation of the party's own mind, free from the influence of any extraneous cause." It is not the duty of an officer or any one else to extort a confession of guilt from a prisoner. On the contrary, the prisoner should be warned that any statement he may choose to make showing his guilt may be used against him on his trial. Ammons v. State, supra.

Of course, a confession is not rendered inadmissible because of the failure of the officer to warn the prisoner that it will be used against him, but it is the duty of the sheriff, when the prisoner is committed to his jail, to see that his constitutional rights are not violated, and that he is not subjected to any undue pressure or unreasonable methods of extorting a confession. The sheriff should not turn the prisoner over to the county or district attorney, representing the prosecuting power, for questioning, or for the application of any illegal methods, which are sometimes resorted to in order to obtain confessions. A prisoner is entitled to protection against violation of his rights, and however desirable it may be to learn facts, no unreasonable methods should be allowed to obtain such facts by extortion or coercion.

The policy of the law, as declared in the Bill of Rights, section 26, secures to prisoners immunity from being compelled to give evidence against themselves. This is as much a part of the law as the statute making given acts a crime. The law of procedure as to prisoners' rights is made a favored policy by the Constitution, and while the detection and punishment of crimes is to be encouraged, yet this end is not to be secured at the expense of the legal rights of an accused person. I am satisfied that the confession was improperly admitted and that the court should have heard the full facts, and produced the testimony taken in the county attorney's office for the information and guidance of defendant's counsel. It might throw a flood of light on the defendant's mental condition, as well as show facts making the confession offered in evidence inadmissible.

It must be remembered that this is not the ordinary case, where a person could give to his own attorney the information sought, for here the defense was insanity, both at the time of the trial and at the time of the alleged crime. It is shown that when counsel first pro-

tested against the arraignment they had not been able to have conference with the prisoner.

It is next complained of as error that the court erred in submitting and exhibiting to the jury the portions of the human body found north of Laurel, and supposed to have been parts of the body of Mrs. Daisy Keeton. There was no evidence on the part of any witness that there were any peculiarities or marks, such as birthmarks, scars, and things of that kind, peculiar to Mrs. Daisy Keeton, and no witness was introduced who claimed ever to have seen that portion of Mrs. Keeton's body corresponding to the parts exhibited. There is no testimony whatever by any witness to show familiarity with such portion of her body, being that part usually concealed by clothing. Although Dr. Ramsey, the family physician, was called and examined the parts of the body which were exhibited to the jury, and testified fully about them, it was not shown by him that he had ever made an examination of such part of Mrs. Keeton's body, nor that there was any resemblance or similarity between Mrs. Keeton's body and that part of the body exhibited to the jury. The prosecuting attorneys insisted that such part was admissible in evidence for the purpose of identification, and to establish the corpus delicti. I have seen no opinion which holds that a dead body, or parts of a dead body, can be exhibited before a jury in a trial for murder. It was highly prejudicial to introduce this evidence, which had been fully described by witnesses, and of which photopraphs had been taken. There was no purpose whatever to be served by the introduction of such parts in this case. There is no proof as to how the person, a portion of whose body was exhibited to the jury, died, further than the confession alleged to have been made by the appellant. The law in regard to dead bodies will be found stated in 30 C. J., p. 150, sec. 361, and in Underhill on Criminal Evidence (4 Ed.), sec. 552. These texts do not support

the action of the court below in admitting such portions of the body to the jury.

It is next insisted that the court erred in admitting the testimony of Drs. Ramsey and Oates, and of other physicians introduced by the state, in rebuttal of the testimony as to insanity, on behalf of the defendant. Drs. Ramsey and Oates had both been called to attend the defendant as physicians, by the defendant and the members of her family. When Dr. Oates was called by the state, he was asked the question, after qualifying:

"State whether or not in the recent past you were called by the defendant to see Miss Ouida Keeton?" "A. I was." "Where did you see her?" A. "In jail." * * * "Q. I will ask you to state from your observation and your knowledge that you have gained of this case from the defendant, from both your personal examination of her and the history of her that you have learned and your own observation here in the courtroom, from all those things whether or not in your opinion she is sane or insane?" "A. It is my opinion that she is sane."

When the doctor was asked the first question, objection was made to this testimony for the same reason and purpose as stated in the objection to the testimony of Drs. Holbrook, Fenno, and Ramsey. When Dr. Holbrook was called by the state in rebuttal, objection was made to his testimony in regard to his examination of the appellant, counsel saying: "If the court please, we are going to object to this, and are going to ask the gentleman a few questions in the absence of the jury." By the Court: "Touching the privilege statute?" Counsel asks that the jury retire. By the Court: "Mr. Collins you may state your point in the record." The jury retired. "We object to this testimony because of the privilege communication statute, there exists the relationship of doctor and patient there. Second: Because

it is in violation of her constitutional rights, compelling her to give evidence against herself.'' Overruled.

When Dr. Fenno was about to testify in regard to his examination of the appellant, counsel said: ''If the court please, at this stage we would like for the jury to retire.'' By the Court: ''Do you make the same objection you made before?'' By counsel: ''Yes, sir. Let the same objection and same grounds be made to the testimony of Dr. Fenno as was made to the testimony of Dr. Holbrook.'' The Court: ''All right—and let it be overruled.''

When Dr. Ramsey was called, the same objection was made to his testimony. Dr. Ramsey had been the Keeton's family physician. When he was called to testify, the same objection was made as in the case of Drs. Holbrook and Fenno. On the question of his relationship as physician, in answer to the question, ''Did you ever have occasion to attend anyone in her home?'' referring to the appellant, he replied, ''I have.''

''Q. When did you first become an attending physician in her home?'' ''A. Well, fifteen years or more—I believe twenty years ago, I wouldn't be definite about the time.'' * * *

''Q. Was the defendant then about the home—the place there?'' ''A. Yes.'' * * *

''Q. What occasion and opportunity did you have along at that time to observe her?'' ''A. Well, I didn't treat her or any of them during that period, but I have seen her in passing.'' * * *

''Q. State whether or not you saw her shortly after her arrest when she was charged with this offense?'' ''A. Yes.'' ''Q. Where was she then, Doctor?'' ''A. She was in jail.'' * * *

''Q. For what period of time did you continue to see her while she was there in jail?'' ''A. She was under my

care from Monday after she was—she was put in jail on Friday, until February 11th." "Q. Until February 11th?" "A. Yes, sir." * * *

"Q. Doctor, when the defendant was first placed in jail, state to the court and jury if you had occasion to diagnose or observe her carefully?" "A. Well, the first time I saw Miss Keeton, she was fully dressed sitting by the radiator, Mr. Valentine, the sheriff, was with me, and she was very much concerned about her health at that time, she had a little fever, a slight cough, with pains, I believe, in the left side of the chest, although her mind was perfectly clear, and she was very much concerned to know about her health." "Q. When did you next see her?" "A. Well, I saw her daily from then on until—through the 11th."

"Q. Now, Doctor, did you consult with her there in the jail." "A. Yes." "Q. State to the jury whether or not she used her voice in talking with you?" "A. Yes, she talked freely." * * *

"Q. From the time you first saw her until you left on the 12th, or saw her on the 11th of February, state whether or not she continued to talk to you?" "A. Yes."

"Q. Now Doctor, you said that she consulted with you—during these periods of consultation, state to the court and jury what the condition of her mind was with reference to clearness and responsibility?" "A. Perfectly normal." "Q. Perfectly normal. Doctor, you have observed her throughout the years, when you first observed the defendant back twenty years ago, was there anything about her condition or attitude, that caused you to—or arouse in you a suspicion as to her mentality or saneness? "A. No, sir." "Q. Have you from the time you first knew her up until the time you saw her in jail, observed anything that arrested your attention on the question of her sanity?" "A. No, sir."

It will be seen that these two physicians, Drs. Ramsey and Oates, were called to consult with and treat the defendant by the defendant and her family. Under section 1536 of the Code of 1930 it is provided: ''All communications made to a physician or surgeon by a patient under his charge or by one seeking professional advice, are hereby declared to be privileged, and such physician or surgeon shall not be required to disclose the same in any legal proceeding, except at the instance of the patient.''

In Davenport v. State, 143 Miss. 121, 108 So. 433, 45 A. L. R. 1348, the question was directly presented as to whether this statute applied to a criminal case. Four of the judges announced their opinion that the statute did apply, and two of the judges were of the opinion that the statute had no application to a criminal case. One of the judges who thought the statute applied to criminal cases generally did not think that a defendant in a criminal prosecution could raise the question of the privilege of the physician of the deceased person for whose death he was being tried, and three of the judges there held that the statute did not apply to a physician who had attended the deceased person, or rather that the defendant in the case, not having employed the physician, could not raise that question. As I understand, four of the judges thought that the statute applies in criminal cases whenever the relation of physician and patient exists. I shall specifically refer to some of the decisions in which section 1536, Code of 1930, has been construed. In Yazoo & M. V. R. Co. v. Decker, 150 Miss. 621, 116 So. 287, in the third syllabus it is said: '' 'Communications' by patient to physician, which Code 1906, section 3695 (Hemingway's Code 1927, sec. 7455), declares privileged, include everything that the physician knows from a physical examination of the patient, as that whisky

was contained in the bottle taken from patient's body, and that, in his opinion, patient died from acute dilation of the heart." In the opinion at page 640 of 150 Miss., 116 So. 287, 291, the court said:

"The privileged communication statute (section 3695, Code 1906 [section 7455, Hemingway's 1927 Code]), provides that all communications made to a physician or surgeon by a patient under his charge, or by one seeking professional advice, shall be privileged, and such physician or surgeon shall not be required to disclose the same in any legal proceeding, except at the instance of the patient, and in the case of Y. & M. V. R. Co. v. Messina, 109 Miss. 143, 67 So. 963, it was held that by this statute it was the purpose of the Legislature to close the lips of the physician concerning any and everything he knows about the patient by oral communication or from a physicial examination of his patient."

In Provident Life & Accident Ins. Co. v. Chapman, 152 Miss. 747, 118 So. 437, it was held that: "The testimony of physicians to facts learned by them from an examination of their patient is privileged and cannot be received in evidence over the objection of the patient. And this is true although one of the physicians so offered was called to examine the patient by an attending physician, and without having made any charge therefor, and without formal employment by the patient. The act of the physician employed in calling in assistants will be treated as the act of the patient in such case."

In Davis v. Elzey, 126 Miss. 789, 88 So. 630, 89 So. 666, it was held that under the above section of the Code, where the relation of physician and patient exists, the testimony of the physician is not admissible as to matters disclosed by virtue of the relation without the consent of the patient, and the placing of other physicians on the witness stand to testify as to facts learned at the same time because or through the relation does not waive the patient's right to object to the evidence of the phy-

sician, though the examination of the patient was made jointly. Citing United States F. & G. Co. v. Hood, 124 Miss. 548, 87 So. 115, 15 A. L. R. 605, where the subject was also discussed fully, and a like holding made.

In Dabbs v. Richardson, 137 Miss. 789, 102 So. 769, it was held under the above section that a physician is not a competent witness to testify as to facts and information received by him in his professional capacity. "He is a competent witness to testify concerning the mental condition of a person, though he is the physician of such person, if his information is derived from social or business relations and not by professional relations. But where his knowledge is derived partly from his relation as a physician and partly from social and business relations, the trial judge may determine his competency in view of all the evidence, and if it appears that his information as a physician influenced his judgment, the judge may exclude his evidence from the jury." At page 807 of 137 Miss., 102 So. 769, 771, it is said:

"It is apparent from the whole examination that most of the knowledge of the deceased's condition was derived from association during the doctor's professional visits, and naturally, a physician would note more attentively during the period of professional treatment the acts and conduct of his patient. Of course there is much that can be observed in business and social intercourse bearing on a person's sanity and the fact that such observations are made by a physician does not disqualify him, provided that his knowledge is not obtained during professional employment. The lines in many cases will be exceedingly difficult to draw, and we are satisfied in the case before us that the Chancellor noted attentively the evidence and observed the parties during the course of the trial, and we are unable to say that he erred in excluding this part of the doctor's testimony."

This decision is pecularily adaptable to the testimony of Dr. Ramsey, and also to the testimony of Dr. Oates. The court did not, in Dr. Ramsey's case, undertake to exclude his testimony as to what he learned professionally in examining the defendant, admitting only what he had observed in a nonprofessional capacity. It was clearly incompetent to admit that part of his testimony which he derived from a professional employment and examination; and the court should have inquired into the matter, excluding this part, which is the main part of his testimony. If this testimony had been segregated, it would have been competent to show that Dr. Ramsey had observed the defendant in a nonprofessional capacity extending over several years, and had been able to form an opinion from such observation. But when we read his testimony, we see clearly that he made no particular observation of her conduct, or that he had no particular opportunity to do so, and his testimony would have been of but little value. But when he examined her professionally at the time involved in the inquiry, his testimony, of course, had great weight; and being erroneous, it could not be said that it is harmless. In the light of all the evidence, it is manifest that his testimony, in the light of the fact that he had been the physician of the appellant's family, carried great weight in the minds of the jury, and largely accounts for their disregard of the strong and convincing testimony of the defendant's own physicians. See, also, Hunter v. Hunter, 127 Miss. 683, 90 So. 440; Metropolitan Life Ins. Co. v. McSwain, 149 Miss. 455, 115 So. 555; McCaw v. Turner, 126 Miss. 260, 88 So. 705; Yazoo & M. V. R. Co. v. Messina, 109 Miss. 143, 67 So. 963; Newton Oil Mill v. Spencer, 116 Miss. 568, 77 So. 605; Hamel v. So. R. Co., 113 Miss. 344, 74 So. 276; Illinois C. R. Co. v. Humphries, 170 Miss. 840, 155 So. 421; Continental Cas. Co. v. Clay (Miss.), 119 So. 593; Miss. P. & L. Co. v. Jordan, 164 Miss. 174, 143 So. 483; Tonkel v. Y. & M. V. R. Co., 170 Miss. 321,

154 So. 351; Provident L. & A. Ins. Co. v. Jemison, 153 Miss. 53, 120 So. 180.

It is said in the majority opinion that the court was acting, in sending physicians to examine the defendant, under the case of Lipscomb v. State, 76 Miss. 223, 25 So. 158. The proceeding there involved took place before the passage of the statute, and, of course, has no application to cases arising since its passage. The examination there involved, also, was merely on the question as to whether the defendant was physically able to undergo trial, and was not used in the trial on the merits. It seems to me that the court would have authority to put it up to a defendant, or to the counsel of defendant, making an application to continue a case, that the defendant either submit to examination by physicians appointed by the court, or in event of refusal to do so, the motion would be overruled. But I do not see how the court, or any public official can compel a defendant to submit to an examination, for any purpose—and especially for the purpose of procuring evidence to be used against his contention in his own defense, in a case pending against him on a charge of crime. To do so would be to force him to give testimony against himself, in violation of his constitutional right. The case of Norwood v. State, 158 Miss. 550, 130 So. 733, cited in the majority opinion, is not applicable here, because in that case a defendant was sought to be arrested for ravishing a little girl, and protested his innocence. The party arresting him suggested that if he were innocent, an examination of his clothing and person might demonstrate that fact. He thereupon voluntarily submitted to the examination, and a difference arising between him and the person making the examination in regard to whether stains found on his clothing were blood, it was then suggested to him that this difference might be correctly settled by means of an examination by a doctor—to which he consented. The doc-

tor was not employed by him, and his submission to an examination was entirely a voluntary act on his part, without any coercion whatever. That case was properly decided on its facts; but its application to the present case is clearly an error. There is nothing in this case to show how Dr. Holbrook and Dr. Fenno came to make the examination of the defendant, except that they were present at the instance of Dr. Ramsey. There is nothing in the record to show that the court directed them to make an examination, or that they were present under an order of the court. Certainly it is too broad a statement to say that an officer other than a circuit judge can compel a person to submit to a physical or mental examination against his will. In the cases of Davis v. Elzey, supra, and Provident Life & Acc. Ins. Co. v. Chapman, supra, it was held that where an attending physician calls in other physicians in making an examination, these consulting physicians will be treated as physicians of the patient, as though employed by him.

The testimony for the defendant, in regard to whether or not she was insane, as stated in the first part of this opinion, was cogent and abundant. The physicians introduced by the defendant all testified, and gave convincing reasons for their view, that the defendant was suffering from dementia praecox of a catatonic type; and that such persons had periods of muscular rigidity which often prevented them from talking; and that they were at times totally unconscious of right and wrong; and that it was the opinion of these professional experts that she was incapable of distinguishing between right and wrong at the time of the commission of the offense. Among other eminent psychiatrists so testifying was Dr. C. D. Mitchell, who is not only a man of great intellect and intrepid and unbending integrity, but who has more than sixteen years actual experience in the State Hospital for the Insane in observing this and other types of insanity. He states that it is impossible for a patient

to malinger throughout all the tests which were applied to her in the present case. All the physicians agree that appellant has symptoms common to dementia praecox of the catatonic type. The physicians who were introduced by the state were of the opinion that the appellant was suffering from what they term "prison psychosis," which they described as a highly developed hysterical affection; and in some instances those so affected are unable to talk. These physicians also agreed that there are many symptoms in common between this "prison psychosis" and dementia praecox of a catatonic type. Dr. Mitchell is supported in his opinion and testimony by Dr. Schmidt, a psychiatrist of large experience and great learning; and also by Dr. McCool, of the State Hospital for the Insane, as well as by a number of other physicians not having quite so much professional experience. One of the doctors described dementia praecox of a catatonic type as follows:

"Q. Explain to the jury what you mean, Doctor, in your own words, by catatonic dementia praecox? A. Praecox means—dementia praecox means dementia young—at the young age, from adolescence on up—it may occur at any age. It is characterized principally by various symptoms, symptoms which are very complex and vary with each individual which is characteristic of all diseases. It usually is characterized first by peculiarities prevailing in early childhood, usually what we call a shut-in personality, secondly, by a fixation, family fixation. What I mean by that is an unnatural, abnormal attachment to a mother or father or some member of the family, then there is the beginning of seclusiveness, they are intelligent as a rule. It is said that an idiot or an imbecile cannot be a praecox. Following that, we have stages of excitement, unusual activity, impulsive outbursts—they are usually unnoticed, nothing is noticed as being wrong with the individual until he commits some act or he becomes unsocial, that is, he

doesn't fit in with the social activities and he is found to be insane, probably his relatives haven't noticed it, they have noticed peculiarities perhaps, but nothing beyond that—then they commit acts of violence, they begin to hallucinate, as we call it, hear imaginary voices, voices of God, voices of those not present, various noises, frequently they have delusions, they have conceptions—ideas based on false conceptions, later they assume what we call the catatonic state, the state where they become mute, clouded, sometimes, that is, they have a period that lasts from a few minutes to several hours, or several days, that they are oblivious to what is going on about them, just the same as in other diseases, same as in delirium of various diseases, they gradually emerge from that and sometimes become fairly normal and the average man can't see what is wrong with them, they have these attacks frequently, more frequently as they undergo deterioration, they become untidy, indifferent, take no notice of what is going on about them.''

One of the physicians who testified for the appellant desired to demonstrate by the patient in the presence of the court and jury, and in the presence of the other psychiatrists, who were observing her in the courtroom, that she could not simulate insanity of this type, by means of a certain test and reflexes; but he was not permitted to do so, for the alleged reason that it would exhaust the defendant. There is an abundance of medical testimony that the defendant was insane during the trial, and unable to take any intelligent part in the trial; which if true, of course, made the trial a mockery; and there is also an abundance of testimony, by lay witnesses, as to her conduct and actions during a period of six months before the commission of the crime. The experts testifying on behalf of the appellant testified that if these facts presented by the lay witnesses were true, they would indicate dementia praecox of the catatonic type. The psychiatrists who testified for the state had only a limited

opportunity to examine and test the appellant, and their testimony would not ordinarily be accepted against the almost overwhelming testimony for the appellant, and there is no doubt in my mind that the jury were largely influenced by the fact that Drs. Ramsey and Oates were the physicians of the appellant, and that they would not testify against her except from the highest motives and desire to tell the truth. I am satisfied that justice would be better promoted by granting a new trial, where all the facts could be fully developed, weighed, and considered in an atmosphere of calmness, uninfluenced by the hysterical pressure of public opinion existing during the first trial. We, of course, can know nothing except the facts contained in the record. We review the work of the court and jury below, and we can pay no attention to reports and rumors arising since the trial. The testimony of the physicians to which we have referred, and from which we have quoted somewhat, show that a person afflicted with the form of insanity claimed for the appellant would have periods of normal quietness and calmness, and would in many respects be normal for such period of time.

It seems to me that the cause of justice and humanity would be promoted by having the facts re-examined, with possible developments which may have come to light since the trial. For these reasons, I think the judgment should be reversed and the cause remanded.

DISSENTING OPINION.

Cook, J., delivered a dissenting opinion.

In my opinion the judgment of the court below should be reversed, and I base that conclusion upon what I conceive to have been prejudicial error in admitting testimony in violation of the privileged communication statute, section 1536, Code 1930. I think this statute has no application unless the relation of physician and pa-

tient actually exists between the objector and the physician; but in this case it clearly appears that the relation, did, in fact, exist between the accused and Dr. Ramsey. As to Dr. Oates, the record merely shows that he was called to see the accused while she was in jail, and it is left in doubt as to whether the relation of physician and patient was established. The record discloses that for a period of about twenty years Dr. Ramsey was the physician in the appellant's home, and that for two weeks following her incarceration in jail she was constantly under his care and treatment for physical disorders. When the testimony of these two physicians was offered, it was objected to on the specific ground that the relation of physician and patient existed between them and the accused; and in the case of United States F. & G. Co. v. Hood, 124 Miss. 548, 87 So. 115, 119, 15 A. L. R. 605, it was held that when the testimony of a physician was objected to on this ground, "the question ought to be directed to ascertaining whether the physician has knowledge by reason of the relation of physician and patient, and, if it was so acquired, it ought to be excluded." It appears to me that the testimony of Dr. Ramsey was clearly incompetent, and under this view it only remains to consider whether or not the admission thereof was sufficiently prejudicial to require a reversal.

The only defense offered by the accused, and, under the facts of this record, the only defense possible for her to make, was that she was insane at the time of the alleged killing. It may be possible that the sane daughter of civilized and respectable parents might kill her mother, with whom she had lived her life in apparent harmony, and for whom she had always manifested an unusual degree of love and affection; and then dissect the body, burn the greater part of it piece by piece, in the fireplace of the home, and dispose of the two remaining pieces by throwing them out of a car near a roadside,

but it is exceedingly difficult for me to conceive of such acts being the product of a sane mind. Human depravity so complete as to account for such fiendish butchery of a mother by a daughter would hardly manifest itself suddenly in the life of a young woman of the type and character mentioned above. There was abundant evidence to support the theory of insanity, and certain it is that upon the entire evidence the question of whether or not the appellant was sane at the time of the commission of the alleged crime was an exceedingly close one; and this being true, it was vitally important that all her legal rights touching this issue should have been carefully preserved and fully granted.

Dr. Ramsey had been a reputable practitioner of medicine in the city of Laurel, and the county of Jones, where the alleged killing occurred, and the trial was had, for more than thirty years, and for twenty years of that time he had been the family physician in the Keeton home; and for about two weeks following her incarceration in jail the appellant had been under his constant care and treatment. In all probability this physician was well known to every member of the jury, and it would not be an unexpected consequence that the jurors would attach more importance to the testimony of the family physician, who had observed the accused for many years, and who had her under his constant care and treatment for days after the tragedy, than they would to the testimony of experts who had never seen the accused except for the limited period when they observed her for the purpose of forming an opinion as to her sanity. It is altogether probable that on the evidence in this record the testimony of this physician turned the scale against the accused. In any event, I am unable to say that the error in the admission thereof was harmless.